JOHN J. PHELAN et al., Individually and on Behalf of All Others Similarly Situated, Respondents, v CITY OF BUFFALO, Appellant.

Fourth Department, November 12, 1976

*Leslie G. Foschio, Corporation Counsel (Carl Tronolone* of counsel), for appellant.

*Moot, Sprague, Marcy, Landy, Fernbach & Smythe (John J. Phelan* of counsel), for respondents.

DILLON, J. Plaintiff Phelan became a resident of the City of Buffalo in June, 1974 and was lawfully a candidate for the city-wide office of President of the Common Council in the November, 1974 election. He was defeated. Local Law No. 1 (1975) of the City of Buffalo, effective January 7, 1975, provides, *inter alia,* that: "No person shall be eligible for election or appointment as a successor to the office of mayor, comptroller, president of the council or councilman-at-large who has not been a domiciled resident of the city for a period of at least two (2) years preceding the date of his election or appointment." (Buffalo City Charter, art 2-A, § 1.)

Prior to the enactment of Local Law No. 1, there had been

no durational residency requirement for eligibility to hold any of the enumerated offices.

Plaintiff's action was instituted on March 21, 1975, seeking a declaration that Local Law No. 1 is unconstitutional and void. He alleges that he intended to be a candidate for the office of councilman-at-large in the 1975 general election, and that his candidacy was proscribed by the newly enacted eligibility requirement. He asserts further that his right to be considered by his political party as an eligible candidate was adversely affected by the law's application.

The court rejected defendant's arguments that there was no justiciable controversy between the litigants and that plaintiff lacked standing to bring the action.

Relying upon *Matter of Berger v Friese* (45 AD2d 734, app dsmd 35 NY2d 712), the court found an absence of a rational relationship between the two-year residence requirement and the right to run for the office of Councilman-at-Large of the City of Buffalo, and declared the local law unconstitutional.

Plaintiff appears in a dual role in this proceeding. He contends that he is aggrieved as an avowed candidate and that his right of suffrage is diluted.

Declaratory judgment is the proper remedy for determining the legal relations of parties to a justiciable controversy (CPLR 3001). Whether an individual has standing to seek such relief is largely determined by whether he has a matured legally protectible interest in the outcome of the case such as to assure concrete adverseness in the presentation of issues *(Baker v Carr,* 369 US 186). One is not entitled to a declaratory judgment absent "concrete legal issues, presented in actual cases, not abstractions" *(United Public Workers v Mitchell,* 330 US 75, 89; *Maryland Cas. Co. v Pacific Co.,* 312 US 270). Whether a case is a proper subject for declaratory judgment shall not be determined by circumstances as they existed when the action was instituted but rather shall be judged by circumstances as they exist when the issues are presented to the court *(Golden v Zwickler,* 394 US 103).

This matter was presented to the court for decision prior to June 9, 1975, which was the first date for candidates for public office to collect signatures on designating petitions. Plaintiff's lawful candidacy in 1974 and his alleged intention to be a candidate in 1975 lend weight to his assertion that Local Law No. 1 was then adversely affecting his opportunity to procure a nomination from the party of which he is a

member (cf. *Storer v Brown,* 415 US 724, rehearing den 417 US 926; cf. also *Chimento v Stark,* 353 F Supp 1211, affd 414 US 802). In that light he was an aggrieved person who was "perceptibly harmed" by the legislation *(United States v SCRAP,* 412 US 669, 688). Having qualified as a candidate in the past under the eligibility requirements then in effect, he had a legally protected interest which was adversely affected in a real and immediate manner by the promulgation of Local Law No. 1. The controversy was thus ripe for judicial determination when it was presented to the court (see 3 Weinstein-Korn-Miller, NY Civ Prac, pars 3001.04, 3001.05).

Additionally, plaintiff's status as a qualified voter in the City of Buffalo gives him standing to seek declaratory relief (see *Landes v Town of North Hempstead,* 20 NY2d 417). While it is true that in *Landes* standing was not an issue because plaintiff was a duly designated nominee of the Democratic Party for the office of Councilman in the Town of North Hempstead, the court held that "the proscription against nonlandowners as town councilmen amounts to a 'dilution' or 'debasement' of the vote" of plaintiff and other residents of the town "not unlike that occasioned by the malapportionment which the Supreme Court has held violative of the equal protection clause." *(Id.,* p 421, citing *Reynolds v Sims,* 377 US 533, rehearing den 379 US 870 and *Gray v Sanders,* 372 US 368.) If we were to opt for a narrow construction of standing and deny a voter an adjudication of a claimed unconstitutional encroachment, his right to equal protection indeed would be hollow (see 3 Weinstein-Korn-Miller, NY Civ Prac, par 3001.04).

Moreover, recent decisions have indicated a departure from the harsh standing requirements which previously had limited the access of potential plaintiffs to the courts in challenging legislation and official actions (see, e.g., *Chimento v Stark, supra; Matter of Dairylea Coop. v Walkley,* 38 NY2d 6; *Boryszewski v Brydges,* 37 NY2d 361; *Matter of Douglaston Civic Assn. v Galvin,* 36 NY2d 1).

Despite the declaration of unconstitutionality by the trial court, plaintiff never became a candidate for city-wide office in 1975, nor does it appear that he attempted to do so. To the extent of plaintiff's candidacy, therefore, the issue is academic and moot *(Matter of Berger v Friese,* 35 NY2d 712, *supra).* We should not refrain from deciding serious constitutional issues, however, where the controversy is of public importance and is

"of a character which is likely to recur * * * with respect to others". *(East Meadow Community Concerts Assn. v Board of Educ.,* 18 NY2d 129, 135; *Storer v Brown,* 415 US 724, rehearing den 417 US 926, *supra; Rosario v Rockefeller,* 410 US 752, rehearing den 411 US 959; *Matter of Oliver v Postel,* 30 NY2d 171, 177; *Rudd v Rudd,* 45 AD2d 22). In the present posture of this case, neither the City of Buffalo, second largest in the State, nor potential candidates or voters, should be left to speculate on the constitutionality of durational residency eligibility for the major offices of the city.

The absence of conclusive authority dealing with the precise classification with which we are confronted warrants a discussion of the applicable law. The question presented is whether a local law, which disqualifies potential candidates for public office until they have completed a two-year residency, unlawfully discriminates against the candidates so impeded or voters who wish to support them.

The Legislature has the power to prescribe qualifications but it cannot enact arbitrary exclusions from office. Any classification establishing qualifications must be nondiscriminatory and have a reasonable relation to the object sought to be accomplished by the legislation *(Landes v Town of North Hempstead,* 20 NY2d 417, *supra).* Age, integrity and training, for example, are recognized in *Landes* as qualifications for office having a rational basis. The question of whether residence may lawfully be established as a classification, however, was left open *(id.,* p 420).

While not yet specifically passed upon by our highest court, candidate durational residency requirements have been constitutionally upheld *(Sununu v Stark,* 383 F Supp 1287, affd 420 US 958; *Chimento v Stark,* 353 F Supp 1211, affd without opn 414 US 802, *supra; Draper v Phelps,* 351 F Supp 677; *Hadnott v Amos,* 320 F Supp 107, affd without opn 401 US 968, and affd 405 US 1035; see, also, *Landes v Town of North Hempstead,* 20 NY2d 471, *supra).* Such a classification will not survive, however, if it is violative of constitutional equal protection and due process clauses *(Landes v Town of North Hempstead, supra,* p 420).

Application of the equal protection clause to a disputed statute requires an examination of "the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in

support of the classification." *(Dunn v Blumstein,* 405 US 330, 335.)

Inherent in the examination of such character and individual interests is the issue of whether the enactment should be judged upon the traditional rational basis test or whether it must withstand a more rigid standard of review *(Bullock v Carter,* 405 US 134, 142). Under the former it will survive unless it lacks rational justification *(McGowan v Maryland,* 366 US 420; *Flemming v Nestor,* 363 US 603). The more stringent test, however, requires a clear showing that the burden imposed is necessary to protect or promote a compelling governmental interest *(Storer v Brown,* 415 US 724, rehearing den 417 US 926, *supra; Dunn v Blumstein, supra,* p 341; *Shapiro v Thompson,* 394 US 618, 634).

The classification here does not fall within the suspect categories of wealth, race, creed or color which would mandate the application of the more demanding standard *(San Antonio Independent School Dist. v Rodriquez,* 411 US 1, rehearing den 411 US 959; *Bullock v Carter,* 405 US 134, *supra;* cf. *Harper v Virginia Bd. of Elections,* 383 US 663; cf. also *Landes v Town of North Hempstead,* 20 NY2d 417, *supra).*

The right to associate for political purposes is constitutionally protected. The imposition of substantial burdens on its exercise is suspect under the First and Fourteenth Amendments unless essential to serve a compelling State interest *(Storer v Brown,* 415 US 724, rehearing den 417 US 926, *supra;* cf. *Dunn v Blumstein,* 405 US 330, *supra; Kramer v Union School Dist.,* 395 US 621). It is well settled that the right of candidacy cannot be foreclosed by invidiously discriminatory classifications *(Storer v Brown, supra; Turner v Fouche,* 396 US 346). Such discrimination "runs afoul of the equal protection and due process clauses of both Federal and State Constitutions" *(Landes v Town of North Hempstead, supra,* p 420).

At the same time, there is no "litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause." *(Storer v Brown, supra,* p 730.) Each confrontation must be decided on its own circumstances and "[w]hat the result * * * will be in any specific case may be very difficult to predict with great assurance" *(id.,* p 730).

Viewing plaintiff and other citizens of Buffalo as voters,

there can be no doubt about the fundamental nature of their right to exercise the franchise. "Other rights * * * are illusory if the right to vote is undermined" *(Williams v Rhodes,* 393 US 23, 31, citing *New York Times Co. v Sullivan,* 376 US 254). It "is preservative of other basic civil and political rights [and] any alleged infringement * * * must be carefully and meticulously scrutinized" *(Reynolds v Sims,* 377 US 533, 562, rehearing den 379 US 870, *supra;* see, also, *Bullock v Carter,* 405 US 134, *supra; Dunn v Blumstein,* 405 US 330, *supra).*

This is not to say that "every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review" *(Bullock v Carter, supra,* p 143). Since the rights of candidates and the rights of voters "do not lend themselves to neat separation", it is essential in analyzing limitations upon candidacy "to examine in a realistic light the extent and nature of their impact on voters" *(Bullock v Carter, supra,* p 143).

Basic qualifications for candidates for municipal office are established in the Public Officers Law (§ 3, subd 1). It is significant that State law only requires that one be a resident of a municipal corporation to be capable of holding civil office. Indeed, plaintiff's 1974 candidacy was lawful under that general mandate. Although history and practice are not determinative of the constitutionality of this residency law, it is undisputed that Buffalo has long survived without it.

While it may be argued that it is unlikely that large numbers of people will move into Buffalo imbued with the immediate desire to run for municipal office and thus the impact of Local Law No. 1 upon candidates and voters will be minimal, the simple fact is that its impact was felt here and, if upheld, will probably be felt in the future. The effect of this exclusionary mechanism is neither incidental nor remote (cf. *Bullock v Carter, supra,* pp 143-144).

Confronted with a residency exclusion having such a discriminatory impact upon the fundamental rights of political association and franchise, it would be inappropriate to apply the traditional equal protection and due process standard. To do so would necessarily require validating the statute since "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory distinction will not be set aside if any state of facts reasonably may be conceived to justify it." *(McGowan v Maryland,* 366 US 420, 425-426.)

Here, however, the burden falls upon defendant to show that the limitation upon candidates and voters is essential to serve a compelling State interest. In that regard, it serves no necessary governmental objective to declare, as does the defendant, that a two-year city resident has a greater familiarity with, and a greater stake in, the problems, conditions, needs and life of his community than a more recent resident.

Moreover, the statistics cited by defendant in support of the restrictive classification are not unlike those which may be cited for many large cities in the State or Nation. They relate to race, age, education, income, unemployment and welfare among its people. These are areas of common interest to many people who live both within and without the geographical limits of a city in a large metropolitan area.

Since a vibrant city is essential to the economic, political, social and cultural climate of a larger community, it is not uncommon for the interest of a non-city resident in its vitality to exceed that of many city residents. In any event, the defendant has wholly failed to demonstrate any compelling governmental need for imposition of Local Law No. 1.

In the view thus taken, we find that the residency restrictions imposed by this legislation invidiously discriminate against plaintiff and others, and violate the equal protection and due process clauses of both Federal and State Constitutions.

On that basis, the judgment should be affirmed.

CARDAMONE, J. P., MAHONEY, GOLDMAN and WITMER, JJ., concur.

Judgment unanimously affirmed, with costs.